1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                           **EASTERN DISTRICT OF CALIFORNIA**

10

11   JUSTIN FLEEMAN,                    )   Case No.: 1:20-cv-0321 NONE JLT
                                        )
12              Plaintiff,              )   FINDINGS AND RECOMMENDATIONS TO
                                        )   GRANT DEFENDANTS' MOTION TO DISMISS
13        v.                            )
                                        )   (Doc. 36)
14   COUNTY OF KERN, et al.,            )
                                        )
15              Defendants.             )
                                        )
16   _____   )

17          Justin Fleeman is a former Chief Deputy with the Kern County Sheriff's Department and was a

18   candidate for sheriff in the 2018 election. Following Plaintiff's defeat by the incumbent, Plaintiff was

19   the subject of an internal affairs investigation for disclosures made during his campaign, and his

20   employment was terminated. Plaintiff seeks to hold the defendants liable for violation of his civil

21   rights under the First Amendment and wrongful termination. In addition, Plaintiff contends the County

22   is estopped from asserting his wrongful termination claims are untimely. (*See generally* Doc. 35.)

23          Defendants seek dismissal of Plaintiff's claims arising under Cal. Civ. Code § 52.1 and Cal.

24   Lab. Code § 232.5, and asserts Plaintiff fails to establish the elements of promissory estoppel or

25   equitable estoppel. Thus, Defendants assert Plaintiff's second and third causes of action in the First

26   Amended Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil

27   Procedure. (Doc. 36.) For the reasons set forth below, the Court recommends Defendants' motion to

28   dismiss be **GRANTED.**

                                               1

## I.    Background and Plaintiff's Allegations[1]

Fleeman was an employee of the Kern County Sheriff's Department for over twenty years. (Doc. 35 at 3, ¶ 12.) In January 2018, "Fleeman notified Sheriff Donny Youngblood that he intended to run a campaign against Mr. Youngblood for Sheriff." (*Id.*, ¶ 13.) Fleeman asserts, "Youngblood "expressed that he felt 'betrayed'" upon learning about Fleeman's intent to run. (*Id.*)

According to Fleeman, "Numerous Sheriff's Department employees were known to … engage in … inappropriate sexual conduct on numerous occasions." (Doc. 35 at 3, ¶ 14.) Fleeman asserts he "reasonably believed that amongst the biggest problems facing the Sheriff's Department was the seemingly rampant, unbecoming, and potentially illegal and inappropriate sexual conduct occurring within the Department." (*Id.*) During the campaign, Fleeman stated that if elected, he "would put a stop to employees engaging in sexually inappropriate conduct - including extra-marital sexual relationships with other Deputies' spouses, sexual relations with subordinates, engaging in sexual relations while on duty, and engaging in inappropriate sexual relations with Sheriff's Activities League participants." (*Id.*)

Fleeman criticized Youngblood during his campaign "for turning a blind eye to such conduct and failing to take adequate and appropriate action to deter such conduct." (Doc. 35 at 3, ¶ 14.) Fleeman alleges that "Youngblood knew about, failed to curtail, and went so far as to ratify and/or approve such inappropriate conduct – as was evident from (among other sources) his numerous promotions of some of the main perpetrators and participants with respect to the conduct at issue." (*Id.*, ¶ 15.) Fleeman contends, "Youngblood routinely reversed, eliminated, and/or diminished discipline imposed upon deputies who engaged in inappropriate sexual behavior." (*Id.*)

At an unidentified time, "while off-duty at a campaign event," Fleeman spoke "in general about various unethical conduct within the Sheriff's Department and how, if elected Sheriff, he would not tolerate it." (Doc. 35 at 6, ¶ 22.) Fleeman alleges that "[h]e provided a hypothetical in which a Sergeant slept with or tried to sleep with another Deputy's wife, was not disciplined, and was later promoted by the Sheriff to Lieutenant." (*Id.*) Fleeman "then questioned whether such conduct is

---

[1] The parties' names are emphasized in capital letters throughout the First Amended Complaint. Likewise, Plaintiff bolded all changes from the initial complaint. In summarizing the allegations, the Court omits the emphasis.

ethical, and stated that, if he were elected Sheriff, such conduct would not be tolerated." (*Id.*) According to Fleeman, "[h]e did not mention any names, and was speaking in hypothetical terms." (*Id.*) However, Fleeman reports that "Youngblood contended this speech constituted an unlawful disclosure of confidential personnel information and dishonesty because, according to [Youngblood], several people in attendance at the campaign event believed [Plaintiff] was referring to a specific incident involving Lieutenant Richard Garrett." (*Id.*)

Fleeman reports that in April 2018, Youngblood was interviewed by *The Bakersfield Californian*. (Doc. 35 at 5, ¶ 18.) According to Fleeman, Youngblood indicated during the interview that Fleeman "'possibly committed a misdemeanor' by talking about rumors that were going through the Sheriff's Office." (*Id.*) Fleeman asserts the newspaper article revealed that Youngblood questioned Fleeman's "fitness for leadership," and stated Fleeman's "aggressive approach… betrayed the trust he placed in him when he repeatedly promoted [Fleeman]." (*Id.*, ¶ 19.) Fleeman reports Youngblood told *The Bakersfield Californian* that "Fleeman's attacks sting," and stated: "I'm getting painted as a bad person by one of my own. That's painful… He's not just attacking me. He's attacking the whole organization." (*Id.*)

On June 5, 2018, Fleeman was defeated in the election by Youngblood. (Doc. 35 at 5, ¶ 20.) The following day, *The Bakersfield Californian* published an article with the headline: "Fleeman returning to Sheriff's Office after election defeat." (*Id.*) Fleeman notes the newspaper stated, "Justin Fleeman is planning to return to work for an organization that may not welcome him back with open arms." (*Id.*) Further, the article stated: "Youngblood criticized Fleeman for running what he believed to be a dirty campaign aimed at ruining his reputation and that of the Sheriff's Office in order to win." (*Id.* at 5-6, ¶ 20.) Thus, Fleeman asserts Youngblood's "retaliatory animus was open, obvious, and repeatedly disclosed to the press (among others)." (*Id.* at 6, ¶ 20.)

On June 29, 2018, Youngblood notified Fleeman "of a pending Internal Affairs investigation 'into allegations [he] disclosed confidential personnel information during [his] recent political campaign for Sheriff of Kern County'" and was "dishonest during the political campaign." (Doc. 35 at 6, ¶ 21.) The County "hired outside Counsel, Karen Kramer, to conduct the Internal Affairs investigation." (*Id.*, ¶ 23.) Fleeman asserts the allegations related to his statements during the undated

campaign event.  (*Id.*, ¶ 22.)  Fleeman reports that he "made general references during the campaign about poor management, favoritism, sexual misconduct, misuse of public funds, and use of excessive force within the Department under the management of [Youngblood]."  (*Id.*, ¶ 24.)  However, he asserts "the underlying accusations of his having disclosed confidential personnel information and having engaged in dishonesty were false."  (*Id.*)  According to Fleeman, "Youngblood knew the accusations were false at the time he made them… but [Youngblood] nonetheless issued the letter in retaliation against [Plaintiff] for running against him in the election, and for reporting and exposing potentially unlawful and improper practices, de facto policies, and inappropriate conduct within the Department."  (*Id.* at 7, ¶ 24.)

Fleeman reports he "was served with a Stay Away Order" regarding defendant Dustin Contreras on August 6, 2018.  (Doc. 35 at 7, ¶ 25.)  Fleeman alleges Contreras was facing disciplinary action at the time, and was offered leniency by Chief Deputy Davis—acting at the direction of Youngblood—"in exchange for [Contreras] making a false complaint against Mr. Fleeman."  (*Id.*)

"On September 18, 2018, Ms. Kramer issued a report regarding her investigation into the complaints" made by Garrett and Contreras against Fleeman.  (Doc. 35 at 7, ¶ 26.)  Fleeman reports that Ms. Kramer concluded "Fleeman more likely than not disclosed confidential personnel information of Mr. Garrett during the course of his campaign for Sheriff."  (*Id.*)  Fleeman asserts the fact that he "undisputedly never referred to Mr. Garrett by name was also documented in Kramer's report."  (*Id.*)  Further, Ms. Kramer's report indicated the "accusations that Mr. Fleeman was dishonest and that he disclosed personnel information of Mr. Contreras… were not sustained."  (*Id.*, ¶ 27.)  Thus, Plaintiff contends the report indicated it was "more likely than not that those incidents did not occur and the accusations were unfounded."  (*Id.*)  Fleeman reports that on September 20, 2018, Youngblood issued "a 'Notice of Administrative Leave/Revocation of Peace Officer Powers' based upon an unspecified 'allegation and related [internal affairs] investigation.'"  (*Id.* at 7-8, ¶ 28, alteration in original.)

Fleeman asserts that on September 26, 2018, he "received a call from Mike Trihey with Channel 17 News in Bakersfield."  (Doc. 35 at 8, ¶ 29.)  Fleeman reports Mr. Trihey informed him that he received information that Fleeman "was put on leave, and he requested comment."  (*Id.*)  Fleeman asserts he "responded that he did not have details, and … had been ordered not to discuss the matter."

4

(*Id.*)  The same date, Fleeman received a text message stating "his case had been leaked to the news media and that a story concerning [his] case had run on the five o'clock news."  (*Id.*, ¶ 30)  Fleeman alleges, "The news segment reported that, 'Fleeman reportedly is under investigation -- but the County isn't saying for what.'"  (*Id.*, ¶ 30.)  He contends the news story placed him "in false light" and "by failing to specify the investigation was an Administrative matter - as opposed to a criminal matter - the County unreasonably and falsely implied Mr. Fleeman had been accused of some sort of crime."  (*Id.*)  In addition, Fleeman asserts the disclosure to the media "violated Kern County's Sheriff's Policy l-100," which provides in relevant part "that names of Department employees subject to disciplinary action or investigation may not be released to the media."  (*Id.* ¶ 31.)  Fleeman observes this is "the same policy [he was] later accused… of violating."  (*Id.*)

According to Fleeman, he discovered at an unidentified time that someone "posted a disparaging meme on the Channel 17 News Facebook page."  (Doc. 35 at 8, ¶ 32.)  Fleeman explains the meme showed his "face superimposed over the body of a sheep and pictures of the faces of 5 other Sheriff Department employees also superimposed over the bodies of sheep with the caption 'One down and a few more to go in his flock.'"  (*Id.*)  Fleeman asserts he believes the meme was posted by defendant David Kessler "in an effort to publicly disgrace, humiliate, and intimidate [Fleeman]."  (*Id.* at 8-9, ¶ 33.)  Further, Fleeman asserts "the meme also [sent] a message to other law enforcement officers not to cross Mr. Youngblood, and not to associate with Mr. Fleeman.  (*Id.* at 9, ¶ 33.)

In addition, Fleeman alleges he learned on September 27 and October 4, 2018, that individuals were discussing Fleeman's administrative leave.  (Doc. 35 at 9, ¶¶ 34-35.)  He reports a sergeant in the Search and Rescue division—who had "no ties to Internal Affairs"— told people "specific details about why [Fleeman] was on Administrative Leave."  (*Id.*, ¶ 34)  Fleeman reports that while others were told details, he "did not know the specifics as to why he was on Administrative Leave."  (*Id.*) Further, Fleeman asserts a second individual stated he knew why Fleeman was on leave because "Youngblood mentioned the allegation during news interviews and… claimed that Mr. Fleeman committed a misdemeanor."  (*Id.*, ¶ 35.)

Fleeman reports that on October 8 and 9, 2018, Mark Nations, the Department Head County Counsel, "told two media outlets that Mr. Fleeman was on paid administrative leave based upon

multiple complaints filed by Sheriff's Office employees." (Doc. 35 at 9, ¶ 37.) Fleeman contends the statement from Nations "was misleading, as the letter placing Mr. Fleeman on administrative leave refers to only one 'allegation and related [IA] investigation,'" and "does not reference multiple allegations." (*Id.*, alteration in original)

On March 5, 2019, Fleeman was served "with a Notice of Proposed Disciplinary Action – Termination." (Doc. 35 at 9, ¶ 38.) Fleeman reports his case was reviewed by T.R. Merickel, Probation Chief, rather than "an unbiased hearing officer." (*Id.*) In the Notice, the County indicated Fleeman's termination was based upon: (1) "disclosure of confidential personnel information concerning Lieutenant Garrett, which The County of Kern contends violated its hostile work environment policy;" and (2) dishonesty, stemming from statements made during the campaign event. (*Id.*) Fleeman contends "none of the accusations have merit." (*Id.*) On May 29, 2019, Fleeman received "a Notice of Disciplinary Action – Termination following a Skelly hearing, terminating his employment effective May 29, 2019." (*Id.*)

Fleeman contends the County's "stated reasons for termination are pretext." (Doc. 35 at 10, ¶ 39.) According to Fleeman, he "was, in fact, fired because he ran against Mr. Youngblood and spoke on matters of public concern, including sexual misconduct within the Sheriff's department and Mr. Youngblood's failure to adequately address such conduct." (*Id.* at 10-11, ¶ 39.)

## II.     Plaintiff's Tort Claims and Administrative Remedies

Fleeman asserts he has complied with the California Tort Claims Act by filing tort claims with the County. (Doc. 35 at 11-12, ¶¶ 41-49.) In addition, he reports he filed an EEOC Complaint to the County's Personnel Department's Equal Employment Opportunity Officer." (*Id.* at 12, ¶ 50.)

### A.     The First Tort Claim

While on administrative leave, Fleeman submitted a "Claim Against the County of Kern" pursuant to Cal. Gov't Code §§ 910, 910.2, and 910.4 on February 28, 2019. (Doc. 35 at 11, ¶¶ 41-42; *see also id.* at 19-26.) In the claim, Fleeman indicated:

> Chief Fleeman submits this Government Tort Claim against the County of Kern and the individuals specified herein for numerous counts of defamation, false light, invasion of privacy, unauthorized use of Chief Fleeman's name and likeness, retaliation for engaging in political activity in violation of Labor Code sections 1101 and 1102, whistleblower retaliation in violation of Labor Code section 1102.5, violations of Chief

6

Fleeman's civil rights under Article 1 of the California Constitution, and violations of the Peace Officer's Bill of Rights (POBRA).

(*Id.* at 21.)  Fleeman described the statements made by Youngblood during the campaign, including those printed in *The Bakersfield Californian*, and asserted that "Youngblood repeatedly disclosed his retaliatory animus to the press." (*Id.* at 21-22.)  Fleeman reported that he was notified of a pending internal affairs investigation on June 29, 2019, shortly after he lost the election. (*Id.* at 22.)

In addition, Fleeman noted in the claim that on September 20, 2018, Youngblood issued a "Notice of Administrative Leave/Revocation of Peace Officer Powers" to Fleeman. (Doc. 35 at 22.) Fleeman stated the investigation and administrative leave "was leaked to the media," and asserted the County placed him in a false light by failing to specify the investigation being made "was an [a]dministrative matter, as opposed to a criminal matter." (*Id.* at 24.)  Further, Fleeman indicated he discovered somebody, who he believed to be David Kessler, posted the "meme on the Channel 17 News Facebook page," which Fleeman believed was "defamatory, an invasion of privacy, an unauthorized use of Chief Fleeman's name and likeness, and a violation of POBRA." (*Id.*) Fleeman reported he believed Kessler posted the meme "in an effort to publicly disgrace, humiliate, and intimidate [him]." (*Id.* at 25.)

On March 6, 2019, the County issued a "Notice of Action Taken on Claim." (Doc. 35 at 11, ¶43; *see also id.* at 28-29.)  The County indicated the claim submitted "was not acted upon by the Board" and was "deemed rejected on its merits." (*Id.* at 28.)  Further, the County expressly reserved:

> 1) The right to challenge the timeliness of the claim (if discovery discloses that the claimant knew or should have known of the alleged occurrence prior to the date of occurrence noted in the claim); 2) the right to assert any statute of limitations defense and 3) the right to assert any prejudice to the County as a result of the failure to present the claim within the time specified in Government Code Section 911.2.

(*Id.*)  The rejection letter also informed Fleeman that, subject to certain exceptions, he had "only six (6) months from the date [the] notice was deposited in the mail to file a court action on this claim." (*Id.*)

## B.     The Second Tort Claim

Fleeman contends that because his first tort claim "was filed prior to his termination…, it became necessary to file a second tort claim after the termination in order to take legal action over the termination of employment." (Doc. 35 at 11, ¶ 44.)  On August 28, 2019, Fleeman filed a second

"Claim against the County of Kern," which he attached to the First Amended Complaint as Exhibit C. (*Id.*, ¶¶ 45-46 ; *see also id.* at 31-42.)

The second tort claim repeated the allegations included in the first claim, through the date Fleeman was placed on administrative leave, with additional allegations related to his termination. (*Compare* Doc. 35 at 21-26 *with* Doc. 35 at 33- 40.)  In addition, the second claim stated, in part:

> Justin Fleeman intends to file suit for money damages and other relief against Kern County and the individuals named herein for injuries he sustained to his reputation (including numerous counts of defamation, false light, invasion of privacy, unauthorized use of Chief Fleeman's name and likeness), for violations of California's Government Code and Labor Code (including retaliation for engaging in political activity in violation of California Government Code sections 3201 et seq., Labor Code sections 1101 and 1102, whistleblower retaliation in violation of Labor Code section 1102.5, and retaliation for engaging in lawful, off-duty conduct in violation of Labor Code sections 96(k) and 98.6), violations of Justin Fleeman's civil rights under Article 1 of the California Constitution, and violations of the Peace Officers' Bill of Rights Act (POBRA), amongst other tort and contract claims.

(*Id.* at 33.)  According to Fleeman, he "was terminated for his general reference and expressed desire to put an end to sexual impropriety and misconduct within the Department."  (*Id.* at 41)  Fleeman also believed he was "fired because he ran against Sheriff Youngblood and lost."  (*Id.* at 42.)  Thus, Fleeman concluded he was fired for "false and unsubstantiated reasons."  (*Id.*)

On September 25, 2019, the County issued a "Notice of Action Taken on Claim."  (Doc. 35 at 11, ¶ 47; *id.* at 44-45.)  The Notice informed Fleeman: "the Second Claim which you submitted to the Clerk of the Kern County Board of Supervisors on September 4, 2019 was not acted upon by the Board. Your Second Claim is deemed rejected on its merits."  (*Id.* at 44.)  The notice also stated:

> Please be advised that each claim set forth in your First Claim is applicable and related solely to your First Claim.  All new issues/allegations/claims which are addressed in your Second Claim will be applicable and related to your Second Claim. If there are continuing issues/allegations/claims set forth in your Second Claim, only the portions of the issues/allegations/claims which occurred after the filing of the First Claim are related to the Second Claim, and are addressed by this Notice.

(*Id.*)  Again, the County reserved the right to challenge the claim and to assert a statute of limitations defense.  (*Id.*)

### III.     Procedural History before this Court

Plaintiff initiated this action by filing a complaint on February 28, 2020.  (Doc. 1.)  Fleeman sought to hold the County, Youngblood, Garrett, Contreras, William Davis, David Kessler, and T.R.

Merickel liable for a violation of his civil rights under the First Amendment. (*Id.* at 11-12, ¶¶ 51-61.) In addition, Fleeman seeks to hold the County liable for retaliation for engaging in political activity, whistleblower relation, wrongful discharge for lawful off-duty conduct, and a violation of PAGA. (*Id.* at 13-15, ¶¶ 62-87.) The County moved to dismiss the claims arising under state law. (Doc. 11.)

The Court determined Fleeman's first tort claim "was sufficient to give the County notice of his claims for retaliation and whistleblower retaliation." (Doc. 29 at 7.) Thus, "the First Claim governed any civil suit addressing Fleeman's retaliation claims, and the civil action should have been filed within six months of the denial of the First Claim, or no later than September 6, 2019." (Doc. 23 at 15.) Because Fleeman filed his initial complaint on February 28, 2020, the Court concluded the causes of action were untimely, and the claims for retaliation and whistleblower retaliation were dismissed without leave to amend. (Doc. 29 at 7-8, 11-12.) In addition, Fleeman's claim for wrongful termination under Cal. Lab. Code § 96(k) was dismissed without leave to amend, but the Court "granted leave to amend to state a wrongful termination claim." (*Id.* at 12.)

On April 26, 2021, Fleeman filed his First Amended Complaint. (Doc. 35.) Fleeman seeks to hold the County, Youngblood, Garrett, Contreras, William Davis, David Kessler, and T.R. Merickel liable for a violation of his civil rights under the First Amendment and for wrongful termination under Cal. Civ. Code § 52.1, Cal. Lab. Code § 232.5. (Doc. 35 at 13-14.) In addition, Fleeman states a claim for "estoppel" against the County, and requests "an order deeming [his] claims for wrongful termination timely and allowing him to proceed with claims of wrongful termination for engaging in protected political speech and activities under California Labor Code sections 1101, 1102, and California Government Code sections 3201 *et seq.*" (*Id.* at 15-16, *see also id.* at 16, ¶ 77.)

On May 26, 2021, Defendants filed the motion to dismiss now pending before the Court. Defendants seek dismissal of the second and third causes of action for wrongful termination and estoppel pursuant to Rule 12(b)(6). (Doc. 36.) Fleeman filed his opposition to the motion on June 9, 2021 (Doc. 38), to which Defendants filed a reply on June 16, 2021 (Doc. 39). The Court found the matter suitable for decision without oral arguments, and the motion was taken under submission pursuant to Local Rule 230(g) and General Order 618. (Doc. 40.)

///

9

# IV.    Legal Standards for a Motion to Dismiss

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In ruling on a motion to dismiss filed pursuant to Rule 12(b), the Court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).

Dismissal of a claim under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations omitted).

Allegations of a complaint must be accepted as true when the Court considers a motion to dismiss. *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976). A court must construe the pleading in the light most favorable to the plaintiff and resolve all doubts in favor of the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, legal conclusions need not be taken as true when "cast in the form of factual allegations." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

"The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  However, the Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998).  To the extent that the

pleadings can be cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## V. Discussion and Analysis

Defendants seek dismissal of the second and third causes of action for wrongful termination and estoppel. (Doc. 36.) Fleeman opposes the motion and asserts that his state law claims are cognizable. (*See generally* Doc. 38 at 11-23.)

### A. Second Cause of Action: Wrongful Termination

Fleeman's claim for wrongful termination is based upon both Cal. Lab. Code § 232.5 and Cal. Civ. Code § 52.1, which is also known as the Bane Act. Defendants argue that Fleeman fails to state a cognizable claim under either provision. (Doc. 36 at 2, 14-18.) In addition, Defendants assert that to the extent Fleeman seeks to state his claim under Cal. Lab. Code § 232.5, it is preempted by the National Labor Relations Act. (*Id.* at 2, 13-15.)

#### 1. Cal. Lab. Code § 232.5

Fleeman seeks to the defendants liable under Cal. Lab. Code § 232.5(c), which provides that an employer may not "[d]ischarge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions." Defendants contend Fleeman fails to state a cognizable claim because he did not complaint about "working conditions" within the meaning of Section 232.5(c). (Doc. 36 at 15-17.)

Notably, the California Labor Code did not define the term "working conditions," and district courts have observed "there is a dearth of case law on this issue." *Tam v. Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1149 (S.D. Cal. 2018) (citing *United States ex rel. Lupo v. Quality Assurance Servs.*, *Inc.*, 242 F. Supp. 3d 1020, 1030-31 (S.D. Cal. 2017). The Southern District observed:

> Examples of working conditions provided in the legislative history material include attire, proper behavior, break room condition, elevator maintenance, seat comfort, temperature, lighting, uniforms, hair requirements, breaks, restroom facilities, and "even one's required attitude." In an enrolled bill report, contained within the legislative history material, working conditions are described as "(e.g., hours, workplace safety, benefits)." In an analysis from the Senate Rules Committee, the reference to working conditions is followed by "(e.g., hours, uniforms, occupation, safety)."

*Lupo*, 242 F. Supp.3d at 1031 (quoting *Massey v. Thrifty Payless, Inc.*, 2014 Cal. App. Unpub. LEXIS

4605, 2014 WL 2901377, at *5 (Cal. Ct. App. June 27, 2014)).  In *Lupo*, adopting the definition identified by the California Court of Appeal in *Massey*, the Southern District concluded that "[w]orking conditions are those conditions determined by the employer as a condition of employment."  *Id.*

Fleeman contends he disclosed working conditions within the meaning of the California Labor Code, because he "disclosed that under Sheriff Youngblood's watch, there was seemingly rampant, unbecoming, and potentially illegal and inappropriate sexual conduct occurring within the Department.'"  (Doc. 38 at 14, quoting Doc. 35 at 3, ¶ 14.)  Fleeman alleged he "awfully exercised his rights to engage in political speech and activities by running a political campaign for Sheriff and giving political speeches during the course of that campaign in which he reasonably and in good faith disclosed information relating to working conditions at the Kern County Sheriff's Office."  (Doc. 35 at 14, ¶ 66.)  Specifically, Fleeman asserts his campaign messages included that if elected: "[He] would put a stop to employees engaging in sexually inappropriate conduct - including extra-marital sexual relationships with other Deputies' spouses, sexual relations with subordinates, engaging in sexual relations while on duty, and engaging in inappropriate sexual relations with Sheriff's Activities League participants."  (*Id.* at 3, ¶ 14.)  Fleeman observes that in the first motion to dismiss, the County indicated "[c]onsensual sexual relations on duty may violate Departmental policy," and asserts this establishes the fact that the County regulated behavior as "working conditions."  (Doc. 38 at 15, quoting Doc. 11 at 13.)

Significantly, there are no facts alleged in the complaint, related to a County policy governing employee behavior, whether on or off duty.  Fleeman also does not allege any facts regarding what statements were made, or to whom, disclosing that deputies "engaging in sexual relations while on duty."  Without such information, the Court is unable to conclude Fleeman made statements that touched on "conditions determined by the employer *as a condition of employment*."  *See Lupo*, 242 F. Supp.3d at 1031 (emphasis added).  Moreover, Fleeman has explained time and again, that his statements were made as a "hypothetical." (Doc. 1 at 6, 7, 9, 10, 25, 29, 54, 58, Doc. 15 at 5, 6, 7, 8, 19; Doc. 35 at 6, 7, 10, 37, 41; Doc. 38 at 6, 7, 8, 9) He offers no legal authority, and the Court has located none, that offering a hypothetical constitutes a disclosure of his working conditions.

Consequently, the Court finds the facts alleged are insufficient to support a claim for wrongful

termination under Section 232.5, and recommends the motion to dismiss the Second Cause of Action, to the extent it is based upon the Labor Code provision, be granted.

### 2. Preemption by the NLRA

The National Labor Relations Act, which protects employees' right to engage in "concerted activities" for mutual aid or protection, and to engage in union activities. *See* 29 U.S.C. §§ 157-158. In cases involving either an actual or an arguable violation of Sections 7 or 8 of the NLRA, both the state and the federal courts must defer to the "exclusive competence" of the National Labor Relations Board. *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 742 (1988) (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959)). NLRA Section 7 protects employees' rights to join labor unions, collectively bargain, and engage in other activities for purposes of mutual aid. 29 U.S.C. § 157. NLRA Section 8 prevents employers from engaging in unfair labor practices or interfering with employees' rights to join labor unions and bargain collectively. 29 U.S.C. § 158.

A claim based on conduct that is arguably protected or prohibited by the Act is preempted and is subject to the exclusive jurisdiction of the NLRB. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). "It is not the label affixed to the cause of action … that controls the determination" of preemption. *United Assoc. of Journeymen & Apprentices v. Borden*, 373 U.S. 690, 698 (1963). Where an alleged claim is based "at least in part on union activities" it is preempted. *See Brands v. First Transit, Inc*., 278 Fed. Appx. 722, 724 (9th Cir. 2008). The party claiming an action is preempted bears the burden of showing that the challenged activity is arguably prevented or prohibited. *Int'l Longshoreman's Assoc. v. Davis*, 476 U.S. 380, 396 (1986).

Defendants contend Section 7 of the NLRA preempts Fleeman's wrongful termination claim under Cal. Lab. Code § 232.5(c). (Doc. 36 at 13-14.) According to Defendants, such a claim is preempted by the NLRA because "[d]iscussions among employees regarding their working conditions regularly have been held to be protected activity under the NLRA" Defendants argue the Labor Code claim is preempted. (*Id.* at 13.) However, as discussed above, there is insufficient information in the pleadings to determine whether Fleeman, in fact, disclosed any working conditions. Similarly, the information is inadequate to determine whether statements made by Fleeman related to "activities for purposes of mutual aid" under Section 7 of the NLRA. *Compare Doe v. Google, Inc*. 54 Cal. App. 5th

13

948 (2020) (finding the NLRA did not preempt the plaintiff's claim under Section 232.5 where the plaintiffs sought to enforce Labor Code provisions that "protect[ed] their activities as *individuals*," and fell under the local interest exception to the NLRA) *with Luke v. Collotype Labels USA, Inc*. 159 Cal.App.4th 1463 (2008) (finding discussions among workers about working conditions are fell under NLRA, which preempted the claim under Section 232.5); *see also Duane v. IXL Learning*, 2017 U.S. Dist. LEXIS 72990 at *9 (N.D. Cal. May 12, 2017) (finding no preemption over a Section 232.5 claim where the plaintiff alleged he was terminated after he informed a supervisor that the plaintiff's employer engaged in discriminatory conduct). Again, given the fact that Fleeman disclaims making a factual assertion and, instead, reports that he spoke only in hypothetical terms (Doc. 1 at 6, 7, 9, 10, 25, 29, 54, 58, Doc. 15 at 5, 6, 7, 8, 19; Doc. 35 at 6, 7, 10, 37, 41; Doc. 38 at 6, 7, 8, 9), the Court cannot find that he made a disclosure that gives rise to consideration of NLRA preemption.

Given the lack of factual allegations and procedural deficiencies related to Fleeman's claim under Section 232.5, the Court declines to make any finding as to preemption by the NLRA.

### 3. The Bane Act, Cal. Civ. Code § 52.1

Fleeman also seeks to hold each of the defendants liable for wrongful termination under Cal. Civ. Code § 52.1, which is known as the Bane Act. (*See* Doc. 35 at 14-15.) The Bane Act provides a cause of action for interference "by threats, intimidation, or coercion" or attempted interference, "with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a). Defendants contend Fleeman's factual allegations fail to support his claim for wrongful termination in violation of the Bane Act. (Doc. 36 at 18-19.)

A claim under the Bane Act "requires a showing of 'an attempted or completed act of interference with a legal right, accompanied by a form of coercion.'" *Martin v. County of San Diego*, 650 F.Supp.2d 1094, 1108 (S.D. Cal. 2009) (quoting *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998)). "The essence of a Bane Act claim is that the defendant, by the specified improper means … tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Simmons v. Superior Court*, 7 Cal.App.5th 1113, 1125 (2016) (citation omitted). Speech alone is insufficient

"except upon a showing that the speech itself threatens violence against a specific person." Cal. Civ. Code § 52.1(k).

Previously, this Court explained: "The text of the Bane Act ... indicates that a cause of action under the act requires a predicate — the application of threat, intimidation or coercion — and an object — interference with a constitutional or statutory right." *Rodriguez v. City of Fresno*, 819 F.Supp.2d 937, 953 (E.D. Cal. 2011). Put another way, a plaintiff must demonstrate that a constitution violation "occurred *and* that the violation was accompanied by threats, intimidation or coercion within the meaning of the statute." *Barsamian v. City of Kingsburg*, 597 F.Supp.2d 1054, 1057 (E.D. Cal. 2009) (emphasis added). Thus, a plaintiff must allege:

> (1) the defendant interfered with or attempted to interfere with plaintiff's constitutional or statutory right; (2) the plaintiff reasonably believed that if he exercised his constitutional right the defendant would commit violence against him, or the defendant injured plaintiff to prevent him from exercising his constitutional right; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm.

*Davis v. Kissinger*, 2009 WL 256574, at *7 (E.D. Cal. Feb. 3, 2009), *reversed on other grounds*, 465 Fed. Appx. 715 (9th Cir. Dec. 19, 2011) (citing *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 883 (2007); *Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1448 (2006))

In the FAC, Fleeman alleges that "Defendants, and each of them, acting under color of state law, interfered with [his] lawful exercise of rights to engage in political speech and to disclose his working conditions by threats, intimidation or coercion." (Doc. 35 at 14, ¶ 66.) Defendants observe that Fleeman "does not explain what threats were made, how he was intimidated, or the nature of any coercion." (Doc. 36 at 19.) In addition, Defendants note that while Fleeman "alleges that false statements were made about him during the election, when Sheriff Youngblood was also on the campaign trail, but he does not allege these statements were made to coerce, intimidate or threaten him into stopping his speeches." (*Id.*, citing Doc. 35 ¶¶ 17-19.) Defendants contend the focus of the allegations in the First Amended Complaint "is that the actions taken against him were <u>retaliatory</u>, which by definition means they occurred afterward." (*Id.*, emphasis in original.) Defendants conclude that "[g]iven the lack of any specified intimidation, coercion, or done in order to interfere with his speech, Plaintiff's Bane Act claim is not cognizable." (*Id.*, emphasis omitted.)

Opposing dismissal of the wrongful termination claim to the extent it is based upon the Bane Act, Fleeman asserts public employees—such as him—"generally have a constitutionally protected property interest in continued employment." (Doc. 38 at 18, citing *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194, 216 (1975).) In addition, he asserts public employees "have the right to engage in political speech as private citizens on matters of public concern, such as a campaign for Sheriff." (*Id.*, citing *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013).) Fleeman contends the allegations in the FAC are sufficient to establish interference because he alleges:

> Defendants falsely accused him of criminal conduct, conspired to make false accusations of misconduct against him, publicly targeted and intimidated him online, and ultimately terminated him from his legally protected position as a law enforcement officer for exercising his rights under the First Amendment. (See FAC ¶¶ 25, 38, 39, 42, Ex. A, Dkt. 35, p. 25 of 58 [alleging "Chief Fleeman believes Sergeant David Kessler posted the above meme on Channel 17 News' Facebook page in an effort to publicly disgrace, humiliate, and **intimidate** Chief Fleeman, and to send a message to the other law enforcement officers not to cross Sheriff Youngblood nor associate with Chief Fleeman."].) (emphasis added).

(Doc. 38 at 18.) According to Fleeman, "[a] reasonable person would have been intimidated by the actions of the Defendants," and their conduct "would chill the expression of first amendment rights by others through sanctioning this kind of politically retaliatory conduct as neither threatening, intimidating, nor coercive." (*Id.*)

Significantly, to the extent Fleeman now argues the Facebook meme interfered with his right to employment, this allegation is not presented in the operative complaint. (*See* Doc. 35 at 14-15, ¶¶ 64-70.) Instead, Fleeman only addresses "his rights to engage in political speech and activities by running a political campaign for Sheriff and giving political speeches during the course of that campaign." (*Id.* at 14, ¶ 65.) However, the meme was posted *after* the election, and thus could not have interfered with his right to engage in political speech and campaign activities as alleged in the amended complaint. Similarly, Fleeman fails to allege facts supporting the conclusion that the posting of the meme by Kessler interfered with his right to employment, as the internal affairs investigation had already been completed and he was placed on administrative leave, which the meme appeared to address with the caption: "One down and a few more to go in his flock." (*See id.* at 8, ¶ 32.)

Finally, in evaluating conduct alleged to have violated the Bane Act, the Court must consider "whether a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the

actions of the defendants *and have perceived a threat of violence*." *Richardson v. City of Antioch*, 722 F.Supp.2d 1133, 1147 (N.D. Cal. 2010) (emphasis added); *see also McCue v. S. Fork Union Elem. Sch. 766* F.Supp.2d 1003, 1011 (E.D. Cal. 2011) ("For the purposes of the Bane Act, the term 'threat' means an "expression of an intent to inflict evil, injury, or damage to another."). Fleeman has not alleged that he was intimidated by any of the defendants or felt coerced to engage in, or not engage in, any actions related to his employment. In addition, Fleeman has not identified any statements by the individual defendants that could reasonably be construed as a threat of violence. Consequently, Fleeman fails to state a claim for wrongful termination under the Bane Act against each of the defendants, and the Court recommends the motion to dismiss the Second Cause of Action to the extent it is raised under the Bane Act be granted.

### 4. Compliance with the California Tort Claims Act

Under the California Tort Claims Act, no suit for "money or damages" may be brought against a public entity until a written claim has been presented to the public entity, and the claim either has been acted upon or is deemed to have been rejected. Cal. Gov't Code, §§ 905, 945.4; *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995). "[S]ubmission of a claim to a public entity is a condition precedent to tort action and the failure to present the claim bars the action." *Lutz v. Tri City Hosp.*, 179 Cal. App. 3d 807, 812 (1986). Thus, "[c]ourts have consistently interpreted the Tort Claims Act to bar actions alleging matters not included in the claim filed with the public entity." *Williams v. Braslow*, 179 Cal. App. 3d 762, 769-70 (1986).

Defendants contend Fleeman's wrongful termination claim is procedurally barred, because the presented tort claims failed to provide adequate notice of claims under Cal. Lab. Code § 232.5 and Cal. Civ. Code § 52.1. (Doc. 36 at 21.) In addition, Dendatns contend the claims "are untimely and should be dismissed." (*Id.*) Fleeman argues his claims are not barred by the Tort Claims Act, and "any claims resulting from the termination of employment are covered by the second tort claim, not the first, and were timely filed." (Doc. 38 at 18-19.)

### a. Notice to the defendants

The purpose of the Tort Claims Act is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of

litigation." *City of San Jose v. Superior Court*, 12 Cal.3d 447, 455 (1974) (citations omitted.) The Government Code sets forth general requirements for a tort claim: the claim must include a general description of the injuries and the names of the public employees who caused them, if known. Cal. Gov't Code § 910. The facts in a written claim must also correspond with facts later alleged in any complaint. *Nelson v. State of Cal.*, 139 Cal. App. 3d 72, 79 (1982). "If a plaintiff relies on more than one theory of recovery, each cause of action must have been reflected in a timely [tort] claim." *Id.*

Defendants observe the tort claims submitted by Fleeman do not reference Cal. Lab. Code § 232.5 and Cal. Civ. Code § 52.1, and do not "mention disclosure of workplace conditions or threats/ intimidation/ coercion to intentionally interfere with a constitutional or regulatory right." (*Id.*) Thus, Defendants argue Fleeman failed to put the defendants "on notice of his specific causes of action and/or the factual basis for them, and his 52.1/232.5 amalgamated cause of action should therefore be dismissed." (*Id.*)

Fleeman argues the notice was sufficient because "a claim need not contain the detail and specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to have done.'" (Doc. 38 at 20, quoting *Connelly v. Cty. of Fresno*, 146 Cal. App. 4th 29, 37-38 (2006).) Fleeman contends, "As with a Complaint filed in court, there is no requirement to cite applicable legal authority to state a claim, so long as the underlying facts upon which the claims is based upon are alleged." (*Id.*, citing *Bealer v. Kern Valley State Prison*, No. 1:16-cv-00367-DAD-SKO (PC), 2017 U.S. Dist. LEXIS 11825, at *4 (E.D. Cal. Jan. 27, 2017) ["Plaintiff need not and should not cite legal authority for his claims in a first amended complaint"].) He asserts that because pleading requirements "for government tort claims[s] are even lower than for those of pleading court," the allegations in the tort claims were sufficient. (*Id.*)

Notably, in both tort claims, Fleeman identified the claims he intended to bring against the County. In the First Tort Claim, Fleeman indicated the causes of action included:

> defamation, false light, invasion of privacy, unauthorized use of Chief Fleeman's name and likeness, retaliation for engaging in political activity in violation of Labor Code sections 1101 and 1102, whistleblower retaliation in violation of Labor Code section 1102.5, violations of Chief Fleeman's civil rights under Article 1 of the California Constitution, and violations of the Peace Officer's Bill of Rights (POBRA).

(Doc. 35 at 21.) In the Second Tort Claim, Fleeman indicated he planned to bring claims for:

18

injuries he sustained to his reputation (including numerous counts of defamation, false light, invasion of privacy, unauthorized use of Chief Fleeman's name and likeness), for violations of California's Government Code and Labor Code (including retaliation for engaging in political activity in violation of California Government Code sections 3201 et seq., Labor Code sections 1101 and 1102, whistleblower retaliation in violation of Labor Code section 1102.5, and retaliation for engaging in lawful, off-duty conduct in violation of Labor Code sections 96(k) and 98.6), violations of Justin Fleeman's civil rights under Article 1 of the California Constitution, and violations of the Peace Officers' Bill of Rights Act (POBRA), amongst other tort and contract claims.

(*Id.* at 33.) Thus, despite clearly identifying provisions of state law—including specific Government and Labor Code provisions— Fleeman did not express an intent to bring a claim under Section 232.5 or the Bane Act. As a result, the Court must determine whether the facts alleged were sufficient to provide notice of these causes of action.

*i.    Section 232.5 claim*

With a claim arising under Cal. Lab. Code § 232.5, the facts alleged must have been sufficient to notify the County that Fleeman believed he suffered harm due to disclosing of "working conditions" within the department.  *See* Cal. Lab. Code § 232.5(c).

In both the First and Second Tort Claims, Fleeman alleged facts similar to those in his FAC regarding his campaign messages.  For example, Fleeman asserted that during the campaign, he spoke "about poor management, favoritism, sexual misconduct, misuse of public funds, and use of excessive force at the Sheriff's Department under the management of Sheriff Youngblood."  (Doc. 35 at 22.)  In the Second Tort Claim, Fleeman asserted:

> One of Chief Fleeman's campaign messages was to the effect that, if elected, Chief Fleeman [would] put a stop to employees engaging in sexually inappropriate conduct - including extramarital sexual relationships with other Deputies' spouses, sexual relations with subordinates, engaging in sexual relations while on duty, and engaging in inappropriate sexual relations with Sheriff's Activities League participants. Numerous Sheriff's Department employees, including Undersheriff Brian Wheeler, were known to previously engage in such inappropriate sexual conduct on numerous occasions. Chief Fleeman understood and reasonably believed that amongst the biggest problems facing the Sheriff's Department was the seemingly rampant, unbecoming, and potentially illegal and inappropriate sexual conduct occurring within the Department.

(*Id.* at 33.)  Neither of the tort claims identify campaign comments from Fleeman that were disclosures of "working conditions," as discussed above, or his belief that the County took action against Fleeman based upon such disclosures.  Because Fleeman did not clearly identify statements about his working conditions within the meaning of the Labor Code, the tort claim did not provide sufficient notice of the

basis of a claim under Section 232.5, such that the County could investigate the claim.

*ii.*      *Bane Act claim*

As noted above, the Bane Act allows an aggrieved individual to bring a civil action for damages when his constitutional or statutory rights have been "interfered with . . . by threats, intimidation, or coercion," or by attempts to threaten, intimidate, or coerce. Cal. Civ. Code § 52.1(a)-(b). Again, Fleeman alleged facts similar in the tort claims and the FAC regarding the actions taken by the defendants, including the posting of the meme on Facebook. However, there are no facts indicating that Fleeman felt intimidated, coerced, or perceived a threat of violence due to the actions of any named defendant. Without such allegations, the County could not be on notice of a claim arising under the Bane Act related to the alleged violations of Fleeman's rights or be aware of the need to investigate acts of threats, intimidation, or coercion. *See Barsamian,* 597 F.Supp.2d at 1057 (a claim under the Bane Act requires that a violation be "accompanied by threats, intimidation or coercion within the meaning of the statute"); *see also Justin v. City & County of San Francisco*, 2008 WL 1990819 at *9 (N.D. Cal. May 5, 2008) (observing that it appeared the "tort claims did not put Defendants on notice of the section 52.1 claim" where the plaintiffs failed to allege facts related to threats, coercion, or intimidation, but declining to resolve the issue because "the claim itself must fail"). Thus, the Court finds the tort claims were insufficient to provide notice of a claim arising under Cal. Civ. Code § 52.1

b.     Timeliness

Even if the defendants were provided proper notice of the causes of action in the tort claims, Fleeman's claims under Section 232.5 and the Bane Act are untimely.

Claims must be presented to the appropriate agency no later than six months after the accrual of the cause of action.[2] Cal. Gov't Code § 911.2(a). The details of the claim need only allege a general complaint with sufficient detail to reasonably enable the public entity to make an adequate investigation. *Blair v. Superior Court*, 218 Cal.App.3d 221, 225 (1990). If a plaintiff seeks to recover on a cause of action based upon facts not set forth in the initial government claim, the plaintiff must timely file a separate claim. *Fall River Joint Unified School Dist. v. Superior Court*, 206 Cal.App.3d

---

[2] Accrual of the cause of action for purposes of the Act is the date of accrual that would be applied under applicable statute of limitations. *Shirk v. Vista Unified School Dist*., 42 Cal. 4th 201, 209 (2007).

431, 436 (1988).  When "a plaintiff relies on more than one theory of recovery …, each cause of action must have been reflected in a timely claim" and the factual basis for each claim must be "fairly reflected in the written claim." *Nelson v State of California*, 139 Cal.App.3d 72, 79 (1982).  Once a claim is submitted, the public entity has 45 days to grant or deny the claim.  *See* Cal. Gov't Code § 912.4.  When the entity sends written notice of the rejection, the lawsuit must be commenced no later than six months after the notice is deposited in the mail.  *See* Cal. Gov't Code § 945.6(a)(1); *Baines Pickwick v. City of L.A.*, 72 Cal. App. 4th 298, 303 (1999).

The timely filing of claims in accordance with the provisions of the Government Claims Act "are elements of the plaintiff's cause of action and conditions precedent to the maintenance of the action." *Willis v. Reddin*, 418 F.2d 702, 704 (9th Cir. 1969); *see also DiCampli-Mintz v. County of Santa Clara,* 55 Cal. 4th 983, 990 (2012) ("The filing of a claim is a condition precedent to the maintenance of any cause of action against the public entity and is therefore an element that a plaintiff is required to prove in order to prevail").  Consequently, compliance with the timeliness provisions may be challenged with a motion to dismiss.  *See Clarke*, 703 F.Supp.2d at 1042; *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1023 (C.D. Cal. 2000).

Fleeman asserts his claims are timely because "the Supreme Court of California holds that a cause of action for wrongful termination does not 'accrue' until the official date of termination." (Doc. 38 at 18, citing *Romano v. Rockwell Int'l*, 14 Cal.4th 479, 493 (1996).)  In addition, he contends the claims are timely "under the continuing violations doctrine," which provides that "where there are a series of wrongs or injuries, the limitations period does not begin to run until the last in the series of events."  (*Id.*, citing *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013).)  Fleeman argues that because he was on administrative leave when he filed the first claim, his injury was not permanent until the termination.  (*Id.*)

### i.    *Continuing violation doctrine*

Under California's continuing violation doctrine, claims for an employer's conduct outside the one-year limitations period are viable if the conduct is "sufficiently linked to unlawful conduct that occurred within the limitations period." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1056 (2005). A continuing violation exists when: "(1) the conduct occurring within the limitations period is similar

in kind to the conduct that falls outside the period; (2) the conduct was reasonably frequent; and (3) it had not yet acquired a degree of permanence." *Dominguez v. Wash. Mut. Bank*, 168 Cal. App. 4th 714, 721 (2008).

Notably, Fleeman does not cite any cases supporting application of the continuing violation doctrine to claims for wrongful termination under Section 232.5 or the Bane Act (*see generally* Doc. 38 at 19-20), and the Court has located none. Indeed, it appears that applying the test from *Dominguez*, his claim of a continuing violation would fail, because there are no similarities between the actions of the individual defendants. For example, Fleeman does not allege facts supporting a conclusion that the actions of Kessler in posting a meme were similar to actions taken by Merickel in overseeing the disciplinary proceedings. Defendants' alleged actions also are not sufficiently similar in nature to termination to satisfy the continuing violation test. *See Kaldis v. Wells Fargo Bank, N.A.*, 263 F. Supp. 3d 856, 863 (C.D. Cal. 2017) (harassing comments are "insufficiently similar" to termination "for purposes of the continuing violations doctrine). Finally, in the First Amended Complaint, Fleeman indicates that he "is <u>not</u> now suing under California state law over the additional adverse employment actions that occurred prior to his February 28, 2019 tort claim." (Doc. 35 at 12, ¶ 48 [emphasis in original].) Because Fleeman's claim is clearly only for wrongful termination— and he is not stating a claim for conduct outside of an applicable statute of limitations— the continuing violations doctrine is inapplicable.

ii.     *Causes of action under the First Claim*

Fleeman notes that "for purposes of filing a [government] tort claim for wrongful termination, the cause of action accrues when the employment is actually terminated, whether by the employer or the employee." (*Id.* at 18-19, quoting *Colores v. Bd. of Trs*., 105 Cal. App. 4th 1293, 1320 (2003).) Fleeman argues because his termination had not yet occurred, "any claims resulting from the termination of employment are covered by the second tort claim, not the first." (*Id.* at 19.)

Significantly, though Fleeman has entitled his second cause of action as one for "wrongful termination," the claims are rooted in a violation of the Bane Act and Cal. Lab. Code § 232.5. (*See* Doc. 35 at 14.) Fleeman contends Defendants are liable for violations of this act that ended with his termination. (*See id.* at 14-15, ¶¶ 64-70.) However, neither the Bane Act nor Section 232.5 require

termination as an element of the claims and were ripe at the time the First Tort Claim was filed. Under Section 232.5, an employer may not "[d]ischarge, *formally discipline*, or otherwise discriminate against an employee who discloses information about the employer's working conditions. Cal. Lab. Code § 232.5(c) (emphasis added). It is indisputable that Fleeman's peace officer powers were revoked, and he was placed on leave, before his First Claim was submitted. (*See* Doc. 35 at 7, ¶ 28.) Thus, his claim for a violation of Section 232.5 was ripe at that time. The Bane Act also does not require termination as an element of the claim, and all alleged actions that support Fleeman's claim had occurred prior to the submission of the First Claim.

As the Court determined previously, the filing of a new tort claim was not required prior to Fleeman filing suit against the County, because there was no legal defect. *See Sofranek v. County of Merced*, 146 Cal.App.4th (2007) (finding a new tort claim was not required where "the first claim was proper and a new claim was not a necessary predicate to filing a lawsuit"), citing Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 1:741, p. 1-159 [limitations period is not extended where the second claim was an "unnecessary amendment")]. Thus, any claims for violations of the Bane Act and Section 232.5 should have been filed within six months of the denial of the First Claim, or no later than September 6, 2019. Because Fleeman did not initiate this action until February 28, 2020, his claims are untimely.

### 5. Conclusion

Fleeman failed to give the defendants notice of claims arising under both Cal. Lab. Code § 232.5 and Cal. Civ. Code § 51.2 in the tort claim, and his claims in the civil action now before the Court were untimely. Even if the claims were not procedurally barred, Fleeman failed to allege facts sufficient to state a cognizable claim for wrongful termination under Cal. Lab. Code § 232.5 and Cal. Civ. Code § 51.2. Accordingly, the Court recommends the motion to dismiss the Second Cause of Action be granted.

### B. The Third Cause of Action: Estoppel

Fleeman seeks to state a claim for "estoppel" against the County. (Doc. 35 at 15.) Notably, this vague title and the following allegations fail to provide Defendants notice of the form of estoppel Fleeman believed is applicable, such as collateral estoppel, promissory estoppel, or equitable estoppel.

(*See id.* at 15-16.) Fleeman acknowledges this deficiency in his opposition to the motion, and clarifies he seeks to apply the doctrine of equitable estoppel. (Doc. 38 at 20-23.)

In general, a claim for equitable estoppel requires: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *Driscoll v. City of Los Angeles* 67 Cal. 2d 297, 305 (1967); *see also Sofranek v. Cty. of Merced,* 146 Cal. App. 4th 1238, 1250 (2007) (same). The California Supreme Court recognized that "the government may be bound by an equitable estoppel … when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 496-97 (1970); *see also Christopher P. v. Mojave Unified School Dist.*, 19 Cal. App. 4th 165 (1993) (applying equitable estoppel to claim under the California Tort Claims Act).

In support of his assertion that the doctrine of equitable estoppel is applicable, Fleeman cites the decision in *Sofranek*, where "the plaintiff filed two tort claims on two separate dates concerning the same incident and injury." (Doc. 38 at 20.) Sofranek filed a claim that was rejected by Merced County, and contained the warming: "If your claim was rejected in whole or in part, you have, subject to certain exceptions, only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim." *Sofranek*, 156 Cal. App. 4th at 1242-43. Sofranek filed a second claim, identifying the same incident "and the amount of the claim and description of the loss were identical to the claim." *Id.* at 1244. However, the second claim included "a five-page attachment which explained in more detail the facts underlying Sofranek's claim and the theories on which it was based." *Id.* at 1243. Merced County investigated the second claim, "which it determined to be an amendment to the [first] claim." *Id.* at 1244. Sofranek's second claim was denied, again with the warning: "If your claim was rejected in whole or in part, you have, subject to certain exceptions, only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim." *Id.* The state court determined the doctrine of equitable

24

estopel was applicable, explaining:

> [T]he County mailed him identical rejection notices which stated he had six months from the date each notice was deposited in the mail to file a state court action on the claims. Only the County knew whether in the application of section 945.6, it would assert reliance upon the first notice of rejection mailed in March 2004 or the second notice of rejection mailed in August 2004. Sofranek alleged that as a result of the warning contained in the August notice, he reasonably believed he had six months from the date of the second notice to file his lawsuit. Given that an amendment to a claim relates back to the original claim for all purposes, including a notice of rejection, Sofranek reasonably could interpret the County's conduct in sending out a second notice in response to the second claim informing him he had six months from the date that notice was mailed to file a court action as manifestation of an intent to waive the County's right to stand upon the first rejection notice. Put another way, by informing Sofranek he had six months from August 2004 to file suit, the County's course of conduct was inconsistent with treating the limitations period as running from the March 2004 rejection notice.

*Id.* at 1251.

Significantly, the facts not before the Court differ from those presented to the state court's application of the doctrine of equitable estoppel in *Sofranek*. Although Sofranek presented two tort claims to Merced County, the second tort claim was merely an amendment to the first claim, because it addressed the same incident, amount of claim, and description of loss. *See id.*, 156 Cal. App. 4th at 1243-44. In contrast, Fleeman's second claim was not an amendment to the first tort claim, and he has not shown the second tort claim should relate back to the first. In addition, the County did not send *identical* rejection notices to Fleeman, as was done in *Sofranek*. Instead, the County explicitly informed Fleeman that it addressed his tort claims separately:

> Please be advised that each claim set forth in your First Claim is applicable and related solely to your First Claim. All new issues/allegations/claims which are addressed in your Second Claim will be applicable and related to your Second Claim. If there are continuing issues/allegations/claims set forth in your Second Claim, only the portions of the issues/allegations/claims which occurred after the filing of the First Claim are related to the Second Claim, and are addressed by this Notice.

(Doc. 35 at 44.) Again, the County reserved the right to challenge the timeliness of the claim and to assert a statute of limitations defense. (*Id.*) Fleeman fails to show he was "ignorant of the true state of the facts," because the County informed him that the tort claims were treated separately. Thus, Fleeman's reliance upon *Sofranek* is misplaced.

Consequently, even if Fleeman's claim for equitable estoppel were properly plead in the First Amended Complaint, the Court finds the facts alleged fail to support application of the doctrine and

25

recommends Defendants' motion to dismiss the claim be granted.

## VI. Leave to Amend

Fleeman requested leave to amend if the Court determined dismissal was appropriate. (Doc. 38 at 23.) Federal Rules of Civil Procedure Rule 15(a) provides that leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id*. at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 532 (9th Cir. 2008).

The Court previously granted leave to amend to attempt to cure the pleading deficiencies, and the plaintiff again failed to state a cognizable claim for wrongful termination. The Second Cause of Action was filed beyond the six-month period provided by California Government Code section 945.6, and this defect cannot be cured. Further, the facts alleged do not support the Third Cause of Action for estoppel. Because Fleeman has alleged no additional facts and not cured the deficiencies, it appears further amendment would be futile, the Court recommends that leave to amend be denied.

## VII. Findings and Recommendations

Based upon the foregoing, the Court **RECOMMENDS** that the County's motion to dismiss (Doc. 36) be **GRANTED** as follows:

1. The Second Cause of Action for violations of Cal. Civ. Code § 52.1 and Cal. Lab. Code § 2325. be **DISMISSED** without leave to amend;

2. The Third Cause of action for estoppel be **DISMISSED** without leave to amend;

3. Plaintiff's request for leave to amend be **DENIED**; and

4. The case proceed only upon the First Cause of Action.

These Findings and Recommendations are submitted to the United States District Judge

26

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be filed within seven days of the date of service of the Objections.

The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated: __**June 24, 2021**__ _____ **/s/ Jennifer L. Thurston**
                                    CHIEF UNITED STATES MAGISTRATE JUDGE